The next case for argument is 23-2186 Agilent Technologies v. Synthego Corp. Your Honor, the decision below has a lot of moving pieces, but this Court need resolve only one issue in order to remand. Did the abandoned pioneer hybrid patent application teach and enable the functionality of the  Because no facts or law support a finding that it showed possession of, much less enabled that functionality. Can I ask for some help here because I got a little confused. The only way I understand this, and I hope you'll agree that's what your argument is, is you're making two really separate arguments. You're making an argument of anticipation based on functionality, and then the enable comes in sort of at the second piece, which is a second argument, which is what had to be enabled. Does this satisfy the enablement requirements? Are they kind of two separate arguments? They are, Your Honor, although they kind of parallel each other a little bit, so I guess it would. I guess it would. It was hard. I really had a hard time just teasing out the one versus two, and I meant two different arguments. Yes. Okay. So I think that's correct, Your Honor, and I guess the way I would draw the distinction is, the first question is, do we think that the pioneer hybrid discloses the functionality of guide RNAs at all? And then, if they do disclose it, have they given enough information that you can enable someone to make it? But even on the first question of functionality, that also includes not enablement per se, but it includes the sufficiency. You bring in testing. You bring in the actual performance, so that's kind of a quasi-enablement thing, but you intend it to be separate on functionality, and then we get to the enablement part, right? I think that is correct, Your Honor, that's right. If we think that the pioneer hybrid reference didn't actually teach functionality sufficient to put people in possession of it, you do not need to resolve anything further. Even if you thought, well, it's written down, the board articulated this new theory that because they called them guide polynucleotides, they must be guiding, then I think you would get to the second question of, is there enablement? Did that actually give enough information for people of ordinary skill in the art to make and use functional guides? Okay, so on the functionality point, the functionality deals with the associating and the targeting stuff, right? Correct. And you're saying that to establish functionality, it's a question, is it what you're saying, to establish functionality, the prior art disclosure has to show that it was actually performed? Is that your argument? No. What's the problem? Why isn't this sufficient to satisfy the functionality? Right. So I think the answer, I think there are two answers to that. First, as to the reasoning the board actually used, which was new reasoning not presented below, their argument, it is because we called it a guide polynucleotide. That has to be wrong, and I think that fact that that is wrong and the board relied on it is independently a ground for remand. On the substantive merits of the evidence, what we suggest is that Pioneer Hybrid threw everything at the wall because it had no idea what might work and what might not work. And so there are a quadrillion quadrillion possibilities, and they said, hey, maybe you could do unmodified guides. Maybe you could do modified guides in six different ways. Maybe you could modify any particular place at two different domains. Their teaching was actually directed primarily at DNA guides that everyone agrees now don't work. But we can't ignore that, right? I mean, we're talking about, and I think the board felt this way too, you make arguments about what they've done or not done sufficiently for the DNA, but that's not what's necessary for this case because we're looking at prior art to this claim limitation that is not DNA. Your Honor, I think the reason it's relevant on the functionality, it is certainly relevant on the enablement point, but even on the functionality point, I think the reason it is relevant is the question is, would a person of skill in the art reading this document feel that they were in possession of functional guide RNAs? And this document doesn't, I think, direct you towards a functional guide RNA. It never actually shows you a functional guide RNA, and the fact that it is suggesting systems that don't work, that we discovered don't work, I think is going to cause the person of ordinary skill in the art reading it to say, this is just a guesswork. So is this a factual or a legal question? I mean, whether it shows sufficient, whatever, actual performance or whatever. The board did quite a thorough analysis of each of those points, including the functionality. So do you agree it's a question of substantial evidence, and you're just arguing that there's not substantial evidence? On this point, I believe that's correct, Your Honor. I think on the original point, right, the fact that the board chose a new and sort of proper theory, right, is reason to remand, independent of this, right? Could you address whether the Pioneer H brand does or does not differentiate functional from the non-functional guides? Certainly, Your Honor. So the PHB does nothing to actually teach functionality. They identify an enormous number of things as guide polynucleotides. That includes DNA sequences. That includes unmodified RNA guides. And the evidence suggests, I think without contradiction, none of those would work. But they call them all guide polynucleotides. And I think the reason for that is they were trying at a very early stage in the process of CRISPR to just see anything that might work to get CRISPR in. So why not suggest everything? There's a point at which they suggest falsely that they had actually performed one of these. The board agrees that that was a misstatement in the application. All these examples are prophetic. Doesn't the reference disclose the modifications that would be made? It discloses a number of possible modifications in a number of possible places. And that disclosure is aimed at towards functionality. Well, we don't know that, Your Honor. So they disclose, as we indicated, a quadrillion, quadrillion possible combinations. We know many of them don't work. We know the only ones they tested don't work. It turns out that among that quadrillion, quadrillion are ones that the patentee figured out how to make work. But that's because the patentee figured out something that is not taught in Pioneer Hybrid, which is you need to use RNA, not DNA. You need to use the 2-primomethyl group. And you need to put the modifications at the ends and not in the middle. And the Pioneer Hybrid affirmatively teaches away from that. And I guess what I would suggest, even if you – All right. Please, there you are. Yeah, getting back to the functionality question, there are a number of prophetic examples that note functionality with respect to the modified guide polynucleotides. What's wrong with that in terms of providing support for the board? Well, I think there actually turn out to be very few that might fit within the scope of the patent claims and that might work. There are a number of references to unmodified guides as possibly functional. We know that doesn't work. There are a number of references to DNA guides, and the vast majority of Table 8 is DNA, not RNA guides. We know those don't work. There is one specific reference that says maybe – and it's the one pointed to by the board – maybe you could co-deliver multiple things and do two CRISPRs at once. There's no reason to think that works as far as I know. No one has ever tried it. That's the one thing where they say you could do this. But I think reading all of that in the context of the uncertain state of the art, a person of ordinary skill in the art is not going to be able to say these people were in possession of functionality. But even if they were, Your Honor, and this is – I think this becomes the enablement piece of things, right? Even if you thought, okay, they wrote down somewhere this kind of bare thing, writing that down is not sufficient to enable somebody to make and use it, particularly given that they said, hey, try anything. Try all these things, and all of these things didn't work. A person of skill in the art, which was new and very uncertain at the time, would have had to do some sort of testing and experimentation to try to figure out which of the quadrillion quadrillion possibilities might work.  But weren't there certain guidelines in terms of the kinds of things you would have to try or test or look at as opposed to the quadrillion quadrillion? Well, no, Your Honor. In fact, I think what Pioneer Herbert does is point you in the wrong direction. They strongly prefer DNA. They suggest DNA. The one thing they actually test is DNA. We know DNA doesn't work. They say you may put the modifications anywhere throughout the sequence. We know that doesn't work, that only modifications to the end work. That brings me to, before your time runs out, to the pure kind of enablement issues, which is like part two of your argument.  Am I correct that the legal issue you're presenting, sort of a la Amgen, is whether or not when you're using prior art for anticipation purposes, you have to deal with enablement of the entire prior art or just show enabling of the limitations that are used for establishing anticipation? It's the latter, Your Honor. We are not arguing, yes. Okay, so we're good and our cases say that. So doesn't that limit the number we're talking about? We're not talking about DNA. We're talking about five example, you know, the examples. So that, if you agree with that legal principle, doesn't it then become a question of substantial evidence question as to whether or not that is satisfied here? Enablement is a question of law based on underlying facts. Right, I was going to say exactly. That's quite a detailed analysis separate from the functionality just on this enablement concluding that there was sufficient. Well, I'm not sure they did, Your Honor, right? Because what they told us was, so it is ultimately a legal question. It is based on factual findings. That's absolutely correct. But to me, the legal question here is if a prior art reference says, try anything, throw things at the wall and see what sticks, right, would a person of ordinary skill in the art know, let me pick out the one thing that the patentee later found out worked, right, or would they have to test to know which of the things might work and which might not work? And here, I think, where Amgen is useful is Amgen says, if all you've got is a trial and error method and there are lots of possibilities, right, that's not sufficient. But part of Amgen, Amgen is different as a legal matter, and that's where the slice and dice comes in in terms of what you have to enable. Because in Amgen, maybe I'm wrong, but I recall you had to look at the entire specification. It was a basic enablement case of a particular patent. This is different, and you've already agreed with me, that you only have to enable in the prior art that specific portion that is relied on to establish anticipation. I absolutely agree with that, Your Honor. And so to do that, what they had to do was teach a person of skill in the art that they could identify a functioning part of this invention without undue experimentation. And what we suggest is no evidence supports that whatsoever because of all the possibilities, because they point in the wrong direction, right, the only way to figure out which of these things might turn out to work is the trial and error method. They are not pointing you or directing you towards the subset of things that work. To the contrary, they are pointing you away. And finally, Your Honor, I would like to note, even if you disagree on both of these grounds, right, I think there's still remit is still appropriate on the dependent claims, on the single-guide RNA claims and the thiopase claims. And here the notable difference is the Board made no specific findings about functionality of those things. So the single-guide RNA claims are not in Table 8. The only single-guides disclosed in Pioneer Hybrid are unmodified ones. There's no indication that says the single-guide claims would have been functional, even in a prophetic example, and the Board makes no specific findings. They merely point back to their earlier findings about general. What about the use of known techniques? Doesn't that begin to limit the use of techniques? Not in this case, Your Honor. I think because this entire technology was less than a year old, there weren't known techniques for this purpose. There were known techniques in how to manufacture guides, and we are not arguing that manufacture is something that a person of ordinary skill in the art couldn't do. The challenge was figuring out which one of them would work, and the only way to do that was to test. And as to the single-guide RNA claims, because there is no specific Board ruling, and as to the thiopase claims, which are not even mentioned in Pioneer Hybrid, there's no specific Board finding of functionality. They merely point back to their general findings that Pioneer Hybrid discloses functionality. We think that is both procedurally improper and in Ray Lee. And you made separate arguments. We absolutely did, Your Honor. And I confess that I'm a little mystified by the suggestion that we've somehow waived this. You will find specifically in the opening brief page 60-61 that we brought it on appeal, and you will find the arguments below in quite a bit of detail at Appendix 794, Appendix 84-88-91 for the single-guide claims, and Appendix 815-816, 806 and 807, and 998 for the thiopase claims. And I'm happy to walk through those right now if you'd like. We're way beyond our time. Thank you, Your Honor. Good morning, and may it please the Court. As the Court established in that questioning, this is essentially a substantial evidence appeal. What's noteworthy is that the phrase substantial evidence doesn't appear at all in the reply brief. There's no effort to show that there's no substantial evidence or to grapple with the standard review. And in the opening brief, it recites it in mechanical form in the standard review section but never uses the phrase to try to apply and meet that standard. And there's good reason for that. And the good reason is that this is a very straightforward case. If you look, this idea that all that pioneer hybrid did was throw things against the wall, right, which is essentially the premise of the appellate argument we just heard, is disposed of by Table 8. If you look at Table 8, and a good place to look at it is in our response brief at 14. That's kind of a handy way to look at it. But Table 8 lists the exact sequence that's an embodiment of the claims at issue and thus in anticipation. The literal sequence down to the base number with the modifications, and it's sequence number 64 and 65, sequence number 66 and 67. So there's not a mystery where you have to go about and try to figure out a big puzzle. It's a preferred embodiment. In Table 8, it says, here are the guide RNAs that you can use. It also includes DNA, it does. But it lists the guide RNAs, and it says, photophosphothiate bonds near ends. And then it shows it with the bonds near the ends. So it's just a head fake. Now, with respect to the DNA, what's to understand is when you approach the pioneer hybrid reference, is what they're essentially saying is guide RNA modifications were known. And they're known, actually, even in the other references that had them in the context of CRISPR. What we're doing is we provide evidence that a new class of molecules, DNA, can also be used. So they're saying, okay, we're going to get out there, we're going to plow new ground with the DNA guides. But the RNA guides are already known. So it would be very natural for someone that wanted to use something and not be on the cutting edge to just use the guide RNA, and then you'd turn to Table 8, and you'd have guide RNA that are the ones they claim. So you have an anticipation. It's that simple. And the rest is fancy lawyer stuff. Now, let me address more specifically. There were two arguments. Judge Post correctly points that. In terms of the functionality, whether it's disclosing that the guide RNA have the functionality of association and targeting, it's absolutely clear. That's the whole point. It says it all over the place. But more to the point, and easier, is that Agilent itself acknowledges that. In their patent owner's response at A788, they referred to a declaration of functionality. So they said there's a declaration of functionality, as though that somehow makes it non-functional. But they acknowledge that it declares functionality. And then in their applied appeal brief before this court, there's sort of a prophetic assertion of functionality. It's not really debatable that there's, in fact, a statement of functionality. The whole point of the guide RNA is that. Forgetting what was said this morning, but going back to the briefs, my understanding of the argument was more of a legal argument, which is that the requirement of the law is that they show actual performance of the functionality. That can't be. Novo Nordisk refutes that. That's not the argument. The argument, I think, is really a factual one, that on these facts, because you have the DNA that didn't show good cleaving, that that court casts doubt on all of it. Well, yeah, they make the testing data as a connection with the cleaving, right? That's the argument. The argument is that for the new ground that Pioneer Hybrid was trying to break in DNA, that because the DNA guides didn't do well in terms of cleaving, you would doubt that the RNA guides work. Which doesn't make any sense, because Pioneer Hybrid itself, and we'll see if Mr. Lemley acknowledges this in reply, states that guide RNA is already known. We're going with a new class of DNA. So their argument is that this DNA really, the gist is that you- That's the testing data, and that deals with cleavage.  But what about, I thought there was kind of a separate argument about how forgetting the testing data, you need to show actual performance. I just think it's based on this argument that the DNA casts doubt on things. But no, because I think the prior case is Novo. And then, of course, Antwerp and Alcon's another one established that, in Alcon, it was chemically stabilizing amount. There was no need for data there. I mean, the patent itself makes clear that it associates with the Cas9, and that it targets the DNA. And another point I want to raise on this is this whole thing, the problem with the DNA is the cleaving, is that it doesn't actually efficiently, it seems, that's the argument from the other side, cleave. But that doesn't mean that it doesn't associate and target. And in fact, with respect to that, their own briefing acknowledges that you might want to do situations where you don't cleave, where you just associate and target. They have that in their brief. I think it's on page 8 of their opening brief. And if that's true, and the presumption of enablement applies, which it does, that's uncontested, the board found that, that's not appealed, and the cases hold that, then you would presume that it does those elements of functionality that are claimed, which is association. Okay, can I move you to the more of the enabling question, although they're getting a little muddled here. But, you know, we're all familiar with Amgen, Professor Lumley was featured in that oral argument at the Supreme Court. Why isn't this like this case? Why aren't we faced with a gazillion things that were unknown? I mean, tell me why. So, factually, I think I dispensed with these gazillion things. Table 8 has four RNAs, and... Okay, what about, I thought we were going to talk about examples 4 and 5. Is that right? Examples 4 and 5 house Table 7 and 8, so it can be a little confusing. Yeah, it can be confusing. But Table 8 is within that, okay? And that just lays it out. It just has the exact sequence that's anticipatory. That's it. But in any event, getting to your point, why is Amgen not legally relevant? Very simple. Amgen, the problem was, they were claiming the whole genus, right? It was everything. There could have been millions of them, and they only showed 28 working. And what the Supreme Court was rightly concerned about, and Professor Lemley for that matter, is how can you claim all of this if so much of it's just unknown and there's not similarity between the 28 you've proven and all the others that you're claiming? This is anticipation. And as such veteran jurists as you know, anticipation, all you need is one embodiment. Pioneer Hybrid doesn't have to enable the entire scope of the claims of the Agilent patents. That would be silly. That's not the law. So it's completely different in terms of the legal structure. That's why Amgen's irrelevant. The Amgen considered that the breadth of the claim versus the disclosure is not at issue here. You may need one embodiment, but you still have to find one. Yes. And at Table 8 right here, it has them, it recommends them, and it's undisputed that this one and this one, which is 84-85 and sequence 86-87, actually fall within the scope. Now, it's just a subsidiary argument we didn't hear today, but it's worth pointing out the third one, which is 58-59. They say, well, that might not work because it's got too many methyls. In other words, they're putting methyl on quite a number of different, and if you look at it, you see those M's. It's almost like every other. The fact is that in claims 18 and 32 of the 034 patent, it claims, the patent it sued, claims more than 20 methyls. So their argument that this has too many methyls to work, it falls within the scope of their claims, because it's got more than 20 methyls is completely inconsistent with their open-ended claim to more than 20, which the board pointed out and said, well, this seems odd that you're saying that this one's inoperative. But it doesn't matter, and it wasn't even argued here. It discloses specific embodiments, and I showed it to your honor, Table 8 right here. And then Table 7 doesn't give you the full sequence, so in that sense it's a little bit of a broader disclosure, but it says you can use two methyl RNA bases, resistance to ribonuclease, which is what you want to avoid, because that can create instability, and phosphofluoride-thiated bonds are very resistant to nucleus cleavage. So it's saying these techniques with RNA work well, and it makes it clear that it's for the functionality, nucleotide base and photodiester bond modifications to decrease unwanted nucleus degradation. That's the functionality. When your time runs out, can you deal with the final argument? The phosphothiate? The PACE? Yes. They call it PACE. Well, there's the single nucleotide, single strand, and phosphothiate. They didn't develop them at all. There was stray references amidst the other argument, but let me address the sGNA, the single guide. Pioneer says they can be single or double right after, or amidst Table 7 and 8, and that's at A2613. So it is expressly disclosed. It says, oh, we're doing those, and they can be single or double. Now the argument that I understand is made is, well, if you do a single sequence rather than a double sequence, you might need special synthesis. The board featuring, I might add, a Ph.D. geneticist from Yale is on the board panel here, the three judges, all technically trained in this area, said, oh, well, the synthesis argument, it's not credible that you're saying there's problems with synthesis. No one could identify what the reason was. You don't have any special synthesis methods in your patent. So if you're saying you need special voodoo, special sauce synthesis in order to do single guide, you don't even tell people how to do it. So the board, in a very meticulously written point, absolutely said it's not credible that synthesis of single guide is... But I think he also was making the point of the insufficiency and the lack of specificity and detail in the board's conclusion, that they just relied to earlier things and they didn't... They spent more time on it... Make findings about reasonable exploitation of success and motivation combined and all of that stuff, so that the board's analysis was deficient or insufficient. Yeah, that's more for the pace, I think, than the single, but I do want to get to the single because it was stated that it wasn't expressly disclosed. And if you look at 2613, you'll see it's very explicitly disclosed. As to the pace and your reasonable expectation of success, the board spent more time on it than Agilent did. But the point being made is these modifications to RNA were well established through many, many systems. Not just CRISPR, but many systems before. And they were well known and there was a variety of them. The methyls that we talked about, but also PAPEs. And so since it was a well-known modification and Pioneer Hybrid suggests using RNA and establishes that RNA was well known, therefore, with respect to pace, you could substitute the pace because pace was another one of the known modifications, which is well established for the backbone, for the phosphodiester backbone. So that's the point. And here, I don't know if it was in the papers, but Agilent seeks a preliminary injunction against SYNTAGO to prevent, to essentially own CRISPR based on modifications that were used by RNA modifications that were used forever for RNA guides. And they're saying, well, doing it in this new context is different, but many, and this was addressed in the secondary considerations, many others proposed and disclosed using RNA guides that had historically been used in CRISPR. And there's no showing that it didn't work, the RNA ones, just the DNA, which was something that Pioneer Hybrid was trying to do as a new thing. With respect to the functionality of modified guide polynucleotides, I mentioned to Professor Lembe that there were a number of prophetic examples, and he seemed to sort of poo-poo those things. The board only addressed, as I understand it, two prophetic examples, but I found a number of prophetic examples in the Pioneer. And what's your comment about whether those prophetic examples have consequence here? Yeah, that's a very valid point, and here's the response. First of all, the law is very, very settled from long ago in this court that saying something should be used without saying that it actually was used, and that's just what prophetic said. Fancy law professor term for, you know, should be used versus would be used. So it discloses that it should be used, that's sufficient. And with respect to RNA, there's no showing that any of the RNAs that are disclosed, Table 7, Table 8, don't work or have any problems. In fact, they basically admit they do work. They fall within the scope of their claims. So it's disclosing it as legally met, and they work, and it's specifying them in Table 8. So it's not a bunch of spaghetti against a wall. All right? Are there any other questions? Yes. I have a question. Sure. This is something that's been in the background of my mind. There seems to be a law made out of it that the Pioneer H brand reference had been abandoned. Right. Can you address that? Yes. I think it's – What's the impact of that? Yeah. It has no impact. There's no challenge from Agilent that's presumed to be enabling, which gets us 90% of where we need to go. They're not challenging that legal principle. They're not saying because it was abandoned that principle doesn't apply. They're just criticizing it that way. In fact, foreign patents have issued off of it, and there's still pending applications we checked this week that are still pending through the system. I think abandoned means in the sense of the way in the U.S. there's continuation practice that the court knows about, so it was just abandoned for another continuation. All right. Thank you. Thank you. Why don't we start three minutes? Thank you, Your Honor. Let me just address a couple of things, one on a sort of factual statement that I think is incorrect in Mr. Reines' argument, and then on the legal issue. He says, Table 8 lists the exact sequence that is the invention and calls it the preferred embodiment. It does not. It never uses the term preferred embodiment, but it does not even show that that sequence will work, and there is no evidence that suggests that the sequence will work. Those are not sequences that fit within the scope. They are truncated sequences, and what the evidence shows, and the board actually does talk about this in some detail, is you can cut down from 20, down maybe to 17. If you cut down to 16, it won't work. What those sequences are are 17, and then they suggest, and now start modifying and cutting them. We don't know to this day whether any of the sequences that Pioneer Hybrid proposes will work. It is certainly not the case that they have shown enablement of those sequences, much less that they were the preferred embodiment and they worked. And that, I think, brings us to the legal point. So the argument here that we are making is not you must always test in order to enable. The argument is you have to test or give us evidence if the person of a skill in the art could not otherwise tell which sequences would work and which wouldn't. IMPACTS makes that clear. The OSI case makes that clear. Even their own case, ALCON, makes that clear. It says you don't have to test if there's no risk or no worry of inoperable species. Here, the PHB is entirely full of inoperable species. The reason it was abandoned, the reason they're still trying 12 years later with a very different set of patent claims to get something, is their proposal, their approach didn't work. What they are saying, as a prior art reference, is, well, you know what? It turns out that when you go back and look at it, the idea that we made work is something that maybe somebody could have found among this enormous number of possibilities. And Judge Wynn asked about the prophetic examples piece, which I did not intend to poo-poo, Your Honor. What I intended to suggest, I think, is if you prophesy things and they keep turning out to be wrong, people are unlikely to believe you. So there are, in fact, prophetic examples throughout PHB that say this would work, this would work, this would work. They turn out one after the other to be wrong or, at the very least, unproven. There's no reason a person of skill in the art reading that would think that, oh, this particular one, unlike all the others, is going to turn out to be correct. The only thing they would do is try to figure out, well, I need to test them. I'm going to have to figure out what to work, and that would require undue experimentation. And then the final point I'd like to make, Your Honor, is on the single-guide RNA, Ove disclosed at 826.13, which he points, are unmodified single-guide RNAs, not within the scope of the claim, not the subject of the invention. And as to thiopaste, there is not even that. So on those claims, we suggest remand is appropriate, even if you agree with him on the other issue. Thank you. Thank you, Your Honor.